IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| LORRAINE COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO.  3:14cv296-WKW |
| | ) | (WO) |
| THE HUGHSTON CLINIC, P.C., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

Now pending before the court is the defendants' third motion to strike Plaintiff's Experts Reports (doc. # 41) filed on December 30, 2014.  The court held oral argument on the motion on January 22, 2015.[1]

Dr. Robert D. Tonks' report is the sole remaining expert witness report at issue.[2]  To say that it has been difficult to obtain a Rule 26 report which provides the pertinent information would be an understatement.  FED R. CIV. P. 26(a)(2)(B) clearly delineates the information that an expert witness who will testify at trial is required to provide in a written report to the opposing party.  Dr. Tonks' expert report must contain the following

---

[1]  Also pending before the court is the defendants' motion to strike Plaintiff's Amended Supplemental Expert Report (doc. # 49) filed on January 22, 2015.  Because the plaintiff did not provide the defendants with the amended supplemental report until immediately before oral argument, the motion to strike was argued but a written motion to strike was not filed until after the argument.  The court will address the motion to strike the plaintiff's amended supplemental expert report (doc. # 49) in a separate order.

[2]  On January 7, 2015, the court granted the defendants' motion to strike Dr. Stewart and Dr. Todd as expert witnesses for the plaintiff because these doctors failed to provide supplemental reports in accordance with prior orders of the court.  *See* Doc. # 45.

information:

> (i) a complete report of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or be deposition; and
> (vi) a statement of compensation to be paid for the study and testimony in the case.

*Id.*

Beyond requiring a "complete report," the rule provides no further guidance. The defendants initially moved to strike the plaintiff's expert witnesses for failing to provide reports that complied with the requirements of FED.R.CIV.P. 26(a)(2)(B). After oral argument on November 7, 2014, the court ordered the plaintiff to provide supplemental expert witness reports that fully complied with FED.R.CIV.P. 26(a)(2)(B). The court specifically informed the plaintiff that "[f]ailure of the supplemental reports to comply strictly with FED.R.CIV.P. 26(a)(2)(B) will result in the court's striking the expert witnesses' reports." *See* Doc. # 28 at 2. The plaintiff's experts were "limited to the opinions and substance of their opinions offered in their initial reports. In other words, the experts *shall not be allowed to expand upon the scope of their opinions that focused on the misplacement of a screw or screws in the plaintiff and what that caused*." *Id.* at 3 (emphasis added).

In his initial, noncompliant report, Dr. Tonks indicated that he had reviewed Dr. Flandry deposition testimony, the plaintiff's deposition testimony, "[r]ecords of Ms. Cook's

2

November 2011 admission to the Jack Hughston Memorial Hospital," and the records of Cook's treating physician, Dr. Donald Lakatosh. Dr. Tonks opined that

> Dr. Flandry, in violation of the standard of care, performed the surgeries of November 30th and December 2nd in a manner that compressed the nerves of the cauda equina (by placing a screw in the neural foramen). As a direct result, Ms. Cook experienced cauda equina syndrome.

(Doc. # 21, Ex. 2).

In his supplemental report dated December 11, 2014, Dr. Tonks noted that he had reviewed the same material but added that he also reviewed "[d]iagnostic imaging including radiographs and CT scans for Ms. Cook." (Doc. # 41, Ex. 1)  He then elaborated on his opinions.

> I am familiar with the standard of care which was required for the performance of sacrolliac joint fusion surgery on November 20, 2011, and December 2, 2011.  The standard of care required that the screws be placed/left inside the "safe zone" within the sacrum and not outside the safe zone.  The "safe zone" is: the corridor of bone, through S1 and S2 sacral vertebrae, through which a screw can pass safely without injury to nerve or valvular structures.  Dr. Flandry violated the standard of care by placing/leaving screws outside the safe zone on November 30th and December 2nd, 2001 (sic) surgeries.  I am also of the opinion that one conducting this procedure in a manner as to place/leave screws outside the safe zone within the sacrum is  not conducting the procedure in as safe a manner as is available, which is also a requirement of the standard of care.  A reason that placing/leaving screws outside the safe zone violates the standard of care is that the expectation would be that so-placing/leaving screws would cause nerve injury 100% of the time - not that it would necessarily happen 100% of time - but the expectation would be that it would happen 100% of the time.

> Further, it is my opinion that the screws being so-placed/left during those surgeries – outside of the safe zone within the sacrum and within the spinal canal – lead to injury of the nerves of the cauda equina.  Finally, it is my opinion that Ms. Cook's injury is permanent.

3

> The exhibits which will be used to support my opinions are a few of the radiological images. These images are post-operative films. This letter will be offered as a summary of my opinions, and a copy of the board summary will be forwarded to you in time for you to get it to the defendants' attorney in time for him to consider it prior to taking my testimony.

(*Id*.)

In the pending motion to strike, the defendants complain that Dr. Tonks' supplemental report "improperly expands upon the scope of the opinions and substance offered in his initial report," and his report "still fails to offer the "why" and "how" required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure." (Doc. # 41 at 9).

The court agrees that Dr. Tonks improperly expanded the scope and substance of his expert report when he offered the opinion that "Ms. Cook's injury is permanent." There is nothing in Dr. Tonks' original report that would allow the court or defense counsel to extrapolate that Dr. Tonks, in his supplemental report, would offer an opinion about the extent and permanence of the plaintiff's injury. That opinion is due to be stricken and Dr. Tonks will be prohibited from testifying about the permanent nature of the plaintiff's injury.

However, the remainder of the supplemental report does not improperly expand the permissible scope of Dr. Tonks' opinions. Relying on *Scholl v. Pateder*, 2011 WL 3684779 (D. Colo. 2011), the defendants argue that Dr. Tonks' supplemental report is due to be stricken in its entirety. In *Scholl*, after comparing the expert's report with his deposition testimony, the court struck five opinions because the expert's report did not "reference these opinions *in any respect*." (*Id*. at *2). That is not the case here.

4

In his initial report, Dr. Tonks opined that

> Dr. Flandry violated the standard of care during both two surgeries on November 30 and December 2, 2011 "in a manner that compressed the nerves of the cauda equina (by placing a screw in the neural foramen). As a direct result, Ms. Cook experienced cauda equina syndrome.

(Doc. # 21, Ex. 2).

In his supplemental report, Dr. Tonks references the standard of care, the placement of the screws, and injury to the nerves "inside the safe zone." (Doc. # 41, Ex. 1). In his supplemental report, Dr. Tonks elaborates on his opinion of how Dr. Flandry violated the standard of care in both surgeries – by placement of a screw or screws outside the safe zone causing injury to nerves in the cauda equina.[3]

According to the defendants, Dr. Tonks expanded his expert opinion by changing his opinion from "the surgeries 'compressed the nerves of the cauda equina,'" to "the surgeries

---

[3] Although neither party deemed it necessary to describe the cauda equina, an explanation supports the court's conclusion that the opinions expressed by Dr. Tonks in his supplemental report are a more detailed elaboration of his initial opinion that screw placement during Cooks' surgeries damaged nerves of the cauda equina.

> The cauda equina (literally, 'horse's tail' after its appearance) is the name given the collection of nerve fibers located at the end of the spinal column. The individual nerves in this part of the spinal cord exit the foramina within the vertebral bones of the spine nearly parallel with the spinal cord itself, unlike the nerves exiting the higher spinal vertebrae, which exit more nearly perpendicular to the central nerve bundle. This gives the cauda equina a collective appearance very much like how a horse's tail looks near to its body. The cauda equina can be found in the bottom third of the spinal canal and from the T12/L1 vertebrae to the coccyx, beyond the conus medullaris into the lumbar region. It consists of 9 to 11 pairs of spinal nerves (including the sciatic nerve) that communicate sensory and motor nerve messages between the central nervous system and the organs from the pelvis and throughout the lower limbs.

http://www.innerbody.com/anatomy/nervous/cauda-equina#full-description (last visited January, 27, 2015).

'lead (sic) to injury to the nerves of the cauda equina.'" (Doc. # 41 at 13.) They also complain that Dr. Tonks initially referenced only a single screw but in his supplemental report, he opines that multiple screws were improperly placed. Finally, they challenge Dr. Tonks' use of the phrases "and/or" and "placing/leaving" to argue that instead of alleging one violation of the standard of care, Dr. Tonks now alleges eight (8) separate and distinct violations of the standard of care by Dr. Flandry. (*Id*. at 13-15). The defendants parse Dr. Tonks' supplemental report too finely.

While it is undisputed that Dr. Tonks' report could have been more detailed and complete, the law does not require the defendants to get an exemplar report, or even a good one.[4] The defendants are entitled to a report that provides sufficient information to ascertain the facts and bases of Dr. Tonks' expert opinion. "However, an expert report need not necessarily contain "sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report" in order to be found to be complete." *Scholl*, 2011 WL 3684779 at *2 (*quoting Cook v. Rockwell Intern. Corp.*, 580 F.Supp.2d 1071, 1121-22 (D.Colo. 2006)). The defendants argue that Dr. Tonks does not sufficiently state "how" Dr. Flandry violated the standard of care in either of his reports. The court disagrees. In his supplemental report, Dr. Tonks elaborates on his original opinion that Dr. Flandry violated the standard of care during both two surgeries on November 30 and December 2, 2011 by placing a screw in the neural foramen "in a manner that compressed

---

[4] During oral argument, defense counsel admitted that he would grade Dr. Tonks' report a 62 which the court notes is usually considered a passing grade.

the nerves of the cauda equina." (Doc. # 21, Ex. 2).

> The standard of care required that the screws be placed/left inside the "safe zone" within the sacrum and not outside the safe zone. The "safe zone" is: the corridor of bone, through S1 and S2 sacral vertebrae, through which a screw can pass safely without injury to nerve or valvular structures. Dr. Flandry violated the standard of care by placing/leaving screws outside the safe zone on November 30th and December 2nd, 2001 (sic) surgeries. I am also of the opinion that one conducting this procedure in a manner as to place/leave screws outside the safe zone within the sacrum is not conducting the procedure in as safe a manner as is available, which is also a requirement of the standard of care. A reason that placing/leaving screws outside the safe zone violates the standard of care is that the expectation would be that so-placing/leaving screws would cause nerve injury 100% of the time - not that it would necessarily happen 100% of time - but the expectation would be that it would happen 100% of the time.

(Doc. # 41, Ex. 1). This is a reasonable amplification of his original opinion, and is not a new opinion not previously disclosed. The defendants will have an opportunity to depose Dr. Tonks, delve into his opinions more thoroughly, and thereafter challenge the reliability of his opinions in a *Daubert*[5] motion.

Moreover, even if the court determined that Dr. Tonks improperly expanded his opinions, excluding his testimony pursuant to FED.R.CIV.P. 37(c)(1) is not warranted at this juncture. FED.R.CIV.P. 37(c)(1) provides that "[a] party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1) . . . is not, *unless such failure is harmless*, permitted to use as evidence at trial, . . . , any witness or information not so disclosed." FED.R.CIV.P. 37(c)(1) (emphasis added). In this case, the defendants were aware

---

[5] *See Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

of Dr. Tonks and had some information about his opinions.  *See OFS Fitel, LLC v. Epstein, Becker and Green, P.C.*, 549 F.2d 1344, 1363 (11th Cir. 2008) ("[T]his is not a case of complete failure to provide information about an expert witness.")  Consequently, the court concludes that striking Dr. Tonks' supplemental report in its entirety is not warranted.

Accordingly, upon consideration of the motion, for the reasons as stated and for good cause, it is

ORDERED the defendants' motion to strike (doc. # 41) be and is hereby GRANTED to the extent that Dr. Tonks is prohibited from testifying about the permanence of the plaintiff's injury at the trial of this matter.  In all other respects, the motion to strike (doc. # 41) be and is hereby DENIED.

The parties are DIRECTED to fully disclose and discuss with Chief United States District Judge W. Keith Watkins, at the pretrial conference of this case, the evidentiary issues surrounding the testimony of Dr. Tonks at trial.

Done this 28th day of January, 2015.

                                          /s/Charles S. Coody
                                          CHARLES S. COODY
                                          UNITED STATES MAGISTRATE JUDGE